1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CHAD ANDREW LARSEN,

Petitioner,

v.

DANIEL PARAMO, Warden,

Respondent.

Case No.  13-cv-04884-JST (PR)

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY**

Chad Andrew Larsen, a California prisoner, has filed this pro se action seeking a writ of habeas corpus under 28 U.S.C. § 2254.  Respondent has filed an answer to the petition, and Petitioner has filed a traverse.  The matter is now before the court for consideration of the merits of the habeas petition.  For the reasons discussed below, the petition is denied.

**I. BACKGROUND**

On September 9, 2008, the Humboldt County District Attorney filed an information charging Petitioner and his father, Dennis Larsen, with conspiracy to commit murder, Cal. Penal Code § 182(a)(1).  Clerk's Transcript on Appeal ("CT")[1] at 631–32.  Petitioner was charged separately with two counts of solicitation to commit murder; one count was later dismissed by the district attorney prior to trial.  CT at 631–33, 1137.

Pursuant to a plea agreement, Dennis Larsen pled no contest to one count of solicitation to commit murder and was granted probation.  Reporter's Transcript ("RT")[2] at 851.  On March 25, 2010, following a jury trial, Petitioner was found guilty of conspiracy to commit murder and

_____

[1] The Clerk's Transcript on Appeal is located at Docket No. 5, Exhibit A.

[2] The Reporter's Transcript is located at Docket No. 5, Exhibit B.

1    solicitation to commit murder.  CT at 1238–45.  Petitioner was sentenced to a term of 25 years to

2    life for the conspiracy charge, and to a term of 9 years for the solicitation charge, to run

3    concurrently with the sentence for conspiracy.  3 CT at 1323–26.

4         Petitioner directly appealed the judgment in the California Court of Appeal.  Docket No. 5,

5    Ex. D.  On April 30, 2012, in a reasoned opinion, the California Court of Appeal affirmed the

6    judgment.  Docket No. 5, Ex. G.  On August 8, 2012 the California Supreme Court denied the

7    petition for review.  Docket No. 5, Ex. I.

8         The instant petition was filed on October 22, 2013.

9                                **II.  STATEMENT OF FACTS**

10        The following background facts describing the crime and evidence presented at trial are

11   from the opinion of the California Court of Appeal[3]:

12        In January of 2008, defendant was arrested and subsequently charged with felony
13        violations of unlawful sexual intercourse and oral copulation with a minor (Pen. Code, §§
         261.5, subd. (c), 288a, subd. (b)(1)), 16-year-old Jane Doe.[1]  While defendant was held in
14        the Humboldt County Jail awaiting trial, his father, Dennis Larsen (Dennis) regularly
         visited him.  To avoid the recording devices on jailhouse phones, defendant would often
15        communicate with Dennis by holding up handwritten notes to the glass partition in the
         visiting room.
16

17             Fn 1.  Subsequent statutory citations are to the Penal Code unless otherwise
               indicated.
18

19        During the first visit defendant told Dennis he "wasn't guilty of what he was charged
          with," and did not want the case "to go forward."  Defendant expressed apprehension to
20        Dennis that should Jane Doe testify against him, he would be convicted.[2]  He hoped she
          would not testify because he feared going to prison and being required to register as a sex
21        offender.

22             Fn 2.  Defendant had been previously convicted of unlawful sex with a minor in
               2006, and was on probation at the time of the 2008 sex offenses.
23

24        Dennis soon realized that defendant "had had sex with a minor."  Defendant "was very
          concerned about scientific evidence" that may "support the charge against him of ...
25        statutory rape."  He repeatedly asked Dennis to "wipe down the front seat" of his truck by

26

27   _____
     [3] This summary is presumed correct.  <u>Hernandez v. Small</u>, 282 F.3d 1132, 1135 n.1 (9th Cir.
28   2002); 28 U.S.C. § 2254(e)(1).

                                              2

rubbing a "tri-tip roast" into the seat to eliminate "DNA evidence" linking him to Jane Doe.  Dennis complied, using a towel soaked in tri-tip or other meat juice.

Evidence was presented that defendant contacted several fellow jail inmates with proposals to kill Jane Doe to prevent her from testifying at trial.  Between February and June 2008, at defendant's request Dennis sent two $500 money orders to two Humboldt County Jail inmates at different post office boxes, each addressed to "our friend."

Defendant also approached fellow Humboldt County Jail inmate Scott Schwartz with a scheme for him to go to the victim's residence, kick the door in, "pretend [to be] police and kill everybody in the house so she couldn't testify."  In May of 2008, defendant enlisted Dennis to pay Schwartz, who by then had been released from jail, $1,500, and give him a ride to San Francisco, in exchange for carrying out the murder of Jane Doe.[3]  Dennis gave Schwartz the money and drove him to San Francisco, but Schwartz failed to perform the murder, and subsequently tried to blackmail Dennis and defendant.

> Fn 3.  Dennis later claimed the money was for a motorcycle defendant was buying from Schwartz, but the sale never took place.

On several occasions defendant offered another inmate he met in the "same tier" of the county jail, William Lenard, money to kill Jane Doe to prevent her from testifying.  Defendant referred to the victim as a "little drug addict whore that didn't deserve to live," and feared that he "would be sent to prison for a long time" if convicted.  Over the course of two weeks, defendant first offered Lenard $1,500, then raised the price to $2,000, to "make sure his witness couldn't testify."  Lenard finally told defendant, "I don't want to hear it no more."

Lenard testified that he overheard defendant talk to "other people" in the common area of the facility, one of them Schwartz, "about having the victim killed" and burying her on property he owned.  Defendant often discussed "different ways" they could kill the victim and "get away with it," and mentioned that if the victim "can't show up," they "don't have a case."  When he was released from custody in May 2008, Lenard reported defendant's murder proposals to his probation officer and a district attorney investigator.

Brian Ekker was defendant's cell mate in Humboldt County Jail.  Defendant told Ekker that he was "worried about" Jane Doe's testimony.  Defendant wanted to pay someone "on the outside" to "get rid of her" so she "would not testify."  He offered Ekker $1,000 and a "broken down three wheeler" to kill Jane Doe.  Defendant suggested Ekker drive by Jane Doe and shoot her.  Ekker refused the offer.  Ekker testified that defendant told him he had asked other inmates, including Schwartz, to murder Jane Doe, but they "took the money" and failed to do the job.

In late April or early May 2008, defendant met inmate Carlton Wallace in the jail.  Defendant told Wallace he feared being convicted, and had offered Jane Doe money not to testify, to no avail.  Defendant asked Wallace to murder Jane Doe for money.  Defendant offered Wallace $5,000, saying Dennis would give him the money.  Defendant told Wallace if he murdered Jane Doe he also could be defendant's partner in a marijuana growing operation he was planning on his father's farm.  Wallace believed defendant's proposal was serious.

Defendant suggested that Wallace befriend Jane Doe, who defendant claimed was a drug addict, and give her a bag of "bad drugs" to kill her.  According to defendant's plan, Wallace would then take her body to Dennis's farm on Port Kenyon Road in Ferndale. Wallace would place the body in a trough tied down with straps, pour concrete over the body, and deposit it under a concrete slab on the property.  Defendant drew detailed maps showing where Jane Doe lived and gave them to Wallace.  He also gave Wallace a detailed description of Jane Doe and wrote out detailed, step-by-step instructions for Wallace to carry out the murder plan.  Defendant provided blueprints of the ranch showing Wallace the location of the materials defendant wanted him to use to conceal the body.  Wallace, who was due to be released soon, was to contact Dennis and tell him, "I was the guy that would carry out the ... plan."  Defendant also directed Wallace to tell Dennis to visit him in jail immediately.

In what Wallace described as "the final plan," he was to meet with Dennis to receive $200 and a "bag of bad drugs" to be given to Jane Doe.  Once he received the drugs, Wallace was supposed to convince Jane Doe to call her mother and say she was going to San Francisco for a week or two with some friends and "didn't want to be bothered," and post a similar message on her "My Space page."  Wallace was then to remove the battery from Jane Doe's cell phone, and tell her to accompany him to San Francisco to bring "back some drugs to Humboldt," in exchange for drugs and cash she would receive.  Wallace was to give Jane Doe tainted drugs "that was supposed to kill her."  If that "didn't kill her," Wallace was directed to snap her neck with "four pounds of pressure" necessary to "break someone's neck."

After Jane Doe was dead, the plan called for Wallace to take the body to the Ferndale farm where he would find shovels to dig a hole, a trough, some tie-down straps, and some fast-drying concrete.  Defendant said he would arrange through Dennis to have the shovels and other materials there.  Wallace was to strap Jane Doe's body into a fetal position with the tie-down straps to make her more compact to fit into the trough, fill the trough with concrete, and bury it under a concrete slab, covering the hole with debris.  Defendant told Wallace he would wait a year or two after he was released, dig up the body, put it in his boat, and dump it in the ocean.  Defendant professed to Wallace that "he'd be safe," and they would both "be rich" marijuana growers.

Defendant drafted a "blueprint of everything" for Wallace, including a drawing of the trough and a note stating exactly what Wallace was to say to Dennis.  The note read as follows: "I know who your son knows and have spent two months with him. I'm the friend he mentioned.... To further your son's, yours, and my own goals, I am going to need seed money and for you—and for you to gather enough QUIKRETE to have fill that gray trough so that I may build a support and the cement ramp and fill the hole.  I have legitimate need myself to do this, and I will do it.  I have no wire, no blackmail, and certainly no mistakes.  This is the only and last time this will be talked about.  And Chad is the one who will pay me when I'm out.  Chad's case will be dismissed when his witness runs away to Mendocino."  Defendant also provided Wallace with a picture of his dog "Wuffle" to give to Dennis, "a picture that he knew his son wouldn't part with."

Wallace believed he was being set up to take the blame for the murder.  He revealed defendant's plan to his attorney, Glenn Brown, and told Brown he did not want to be

4

involved.  Brown reported the matter to the district attorney's office, which sent Chief Investigator Hislop and two other investigators to interview Wallace.  Wallace provided the investigators with some or all of the writings he received from defendant, presumably the detailed instructions and maps, plus a picture of a dog.

The investigators fitted Wallace with a recording device.  Wallace recorded a conversation in which defendant again detailed the murder plot.  In the recorded conversation, defendant tells Wallace: "[W]hat I was thinking is you go into my dad's garage.... You grab three tie-down straps.... And the three tie-down straps, you put 'em, you put her feet in ... fetal position.  You tie one around one knee, one around her shin, and you crank down."  Wallace asks, "While she alive?"  Defendant replies, "Fuck no.  When she's dead.  You crank down, crank down, crank down.  Get her as small as possible, right?"  He continues by saying that once Jane Doe was "compact" Wallace would put her in the "tub"— presumably the trough—in the bottom of the hole ("put her one thirty pound ass in"), then fill it with concrete.  Wallace asked what he should do if there were no concrete at the farm. Defendant replied, "I'll ... just have dad go get it."

On June 12, 2008, Wallace was released from the Humboldt County Jail, but was transferred to the Del Norte facility so defendant would think Wallace had been released from custody.  At 11:00 that morning, Wallace called Dennis as defendant had directed and identified himself as Carl, someone who knew defendant.  Wallace told Dennis to visit defendant in the jail immediately.

Dennis and Roy Potvin, a longtime family friend, visited defendant at the jail on June 12.  Defendant held up a piece of paper for Dennis with Wallace's name and phone number and told Dennis he must give Wallace $500 immediately.  Dennis testified this note read, "You must pay this man $500 and here's a phone number.  You must call this.  Don't forget."  Apparently, the note stated in large bold letters, "Last Time."

Despite Dennis's testimony on the content of the note defendant displayed to him during the visit on June 12, the record is less than clear on the exact text of the note.  Wallace testified regarding two other notes which defendant may have held up during a visit with Dennis. One note read: "To show he's legit, Carl will dig under the ramp behind the barn to put in the new foundation.  Cash in McKinleyville.  Buy five bags of Quickrete.  Hand Carl shovels, the gray three-layered trough, five-gallon buckets, a heavy chain, and three heavy duty, tie-down straps...."  Another note read: "This is the final time.  I go to court on Friday, 13th.  I need my problem fixed.  He knows my problems, friends.  Talk to him.  Give him $500 from my bank account so he can buy supplies to build a cement support under the ramp."[4]

> Fn 4.  Defendant's reference to a Friday the 13th court date is revealing. We take judicial notice that the day of the visit, June 12, 2008, was a Thursday.

On the afternoon of June 12th, Dennis went to the credit union, as defendant asked, to withdraw $1,000—$500 to pay some bills and $500 for "Carl."[5]  Later that day, Dennis received a second call purportedly from Carl, who this time was Probation Officer Greg Allen posing as Carlton Wallace.  "Carl" told Dennis he needed shovels and $500.  Dennis suspected there was going to be "a hit," and someone may be killed.  He expressed concern to friends that defendant was trying to have Jane Doe killed.

Fn 5.  Dennis testified he thought the $500 was money defendant owed Carl, or possibly for protection in jail or to help finance defendant's planned marijuana farm.

Nevertheless, Dennis participated in the scheme described to him by the man he thought was defendant's friend Wallace.  Dennis and Potvin went to a hardware store where Dennis bought two shovels, some tape, and some permanent markers.  They then went to Dennis's ranch in Ferndale, and left the two shovels and $500 in an envelope next to the mailbox for Wallace.  Dennis put a note in the envelope telling Wallace he would receive no more money.  Dennis received a call from "Carl," and told "Carl" the items were waiting for him.

Dennis received several more calls from "Carl" which were recorded by investigators.  "Carl" spoke in detail about the murder plot.  Dennis became uneasy and upset when "Carl" requested help to bury a body behind the barn, and told "Carl" that "the deal is off."  Dennis realized that "this person" intended to enlist his assistance in the commission of a murder, and went to the Ferndale property to attempt to retrieve the shovels and money— which were gone, having been removed by investigators.[6]

Fn 6.  According to Hislop's testimony, this "final plan" for the hit—the placing of the shovels and money, presumably—was not something that originated from Wallace, but from "Carl" at Hislop's direction. But the "final plan" was certainly consistent with the plans emanating from defendant.

For "damage control" and to "cover his ass," Dennis reported the possible murder plot against Jane Doe to the Ferndale police at 5:00 that afternoon, and gave a voluntary statement to Investigator Hislop and another officer.  Dennis was later arrested, and ultimately entered a plea of no contest to solicitation to commit murder (§ 653f, subd. (b)) and being an accessory to a crime (§ 32).  Hislop subsequently interviewed Schwartz, who told him Dennis was part of the conspiracy to murder Jane Doe.

Defendant testified on his own behalf.  He admitted a prior conviction for "consensual 'sexual intercourse with a minor'" (§ 261.5, subd. (c)), and his 2009 convictions for sex offenses with Jane Doe.[7]  He did not contact Jane Doe after January of 2008.

Fn 7.  We affirmed the convictions. (People v. Larsen (Dec. 8, 2010, A126424, 2010 WL 4975560) [nonpub. opn.].)

Defendant denied that he paid Jane Doe any money, or ever personally or through Dennis contacted her parents or boyfriend to seek to prevent her from testifying against him.  He never threatened her or her family.  He never asked anyone to kill Jane Doe so she would not testify.  The $500 payments that Dennis described making to various jail inmates had nothing to do with Jane Doe, but were payments for protection from physical assault inside the jail.

Defendant had problems growing up, including learning disabilities, and was not liked by his teachers or his classmates.  As his problems continued in high school, his teachers recommended counseling.  His counselors referred him to psychologists.

6

Rather than socializing with others, defendant kept to himself and played video games or computer role-playing games, like Dungeons and Dragons and Pools of Radiance, that were derived from comic books. The comic books were all based "on female heroines combating crime, defeating the bad guys using friendship and teamwork."

During high school, defendant spent more time participating in role-playing games, and made some friends "who liked to role play" on a serious level. Defendant testified that in role playing there is always a "game master" who defines the mission and the scenarios and takes command of the game.[8]

> Fn 8. Defense witnesses testified the game master controls the game, selects the scenarios, selects the characters, and chooses what world the game occurs in. Scenarios can come from role-playing books, comic books, or movies.

While in county jail, defendant made two payments of $500 through Dennis to a fellow inmate Fred Schallenberg for protection. Defendant also approached Schwartz for protection from "an inmate named Josh Cooly" who repeatedly threatened to stab him. In exchange, defendant gave Schwartz food from his tray and "bought him commissary." He also socialized with Schwartz; they read defendant's comic books. Defendant testified that the $1,500 he paid to Schwartz was for a motorcycle and a ride to the Delancey Street program, not to kill Jane Doe.

Defendant met Wallace in jail through Schwartz. Defendant and Wallace exchanged information on their cases and people they knew in common, including Jane Doe and her friends Lindsay and Sarah. Wallace told defendant he was their "drug dealer."

Defendant grew to trust Wallace, and they discussed a future marijuana cultivation operation on defendant's property in Ferndale to be run by Wallace when they were released. The $500 defendant asked Dennis to give Wallace was for a soil analysis of the planned marijuana farm.

Defendant and Wallace began to engage in discussions about "role playing" related to their cases and "things that [they] knew in real life," such as "keeping a witness from testifying." He and Wallace engaged in "lots" of role-playing games. Wallace was the acknowledged "game master," who orchestrated the role playing by giving defendant verbal or body language cues.[9] Wallace threatened that he would not participate in the marijuana cultivation venture unless defendant followed his role playing signals.

> Fn 9. Supposedly, Wallace had the words "game over" tattooed on his arms. If he folded his arms to reveal "game," the game was on; to reveal "over," the game was off. As defendant put it, "[A]s we were talking, I would slip back and forth between real and fake depending on how he would hold his arms."

Their discussions about Jane Doe were not related to an actual conspiracy to kill her, but rather merely part of their role-playing games in which defendant and Wallace invented various scenarios based on comic book stories and role-playing books defendant had in jail. Defendant explained: "The quotes, the scenarios, some of the characters' names such as Deacon, Sarah, Dennis, et cetera, which were also in the comic books and matched people we knew in real life."

7

As part of their role-playing game, the victim was to be buried in a gray water trough. Wallace used the trough because it was something from Dennis's ranch with which defendant was familiar.  One of the bases for their role-playing game was the heroine in the comic book Empowered, who is tied and chained up and compacted in a trough or oval hole, but is saved by her fellow heroes and does not actually get killed.[10]  Defendant testified, "No heroine ... ever gets killed in any of my comic books that I know of."

> Fn 10.  Typically, some role players are villains and some are heroes. In the game World of Darkness, each player was to "start as a regular person" and then "work to becom[e] a hero and stop[ ] a great evil."

Catherine Silver, a psychiatric physician's assistant for Dr. Irving Tessler, testified as a defense expert on Asperger's Syndrome and Autism.  In her capacity as assistant to Dr. Tessler, Silver diagnosed and treated patients with Autism, Asperger's Syndrome, and other psychiatric disorders.  Asperger's is a "high-functioning variant of Autism," which manifests itself primarily in social dysfunction.  A child with Asperger's will have difficulty making friends.  He will talk obsessively about topics that interest him without "picking up on social cues."  He will lack social or mental filters, and thus say whatever he is thinking without regard to whether it is appropriate.

Defendant was diagnosed with Asperger's Syndrome around 1997, and became a patient of Dr. Tessler in the early 1990's.  Silver reviewed defendant's records, examined him, and personally diagnosed him with Asperger's Syndrome.

Silver testified that role playing is a "huge obsession" with defendant that occupies "hours and hours of time."  It provides him with a social outlet, a place where he can be accepted by others who are themselves obsessed or otherwise disabled.  According to Silver, role playing occupies so much of defendant's time that "he doesn't live in the real world.  He lives in a[n] intellectual fantasy world much of the time."

Silver also testified that defendant is socially naïve and is susceptible to manipulation by others.  He can be influenced to say things against his own interests that are consistent with his fantasies.  Because defendant has no social filter and always speaks what is on his mind, a clever person can manipulate him to act contrary to his own interests.  He also has a "desire at any cost" to please others and give them "something to get them to be his friends."  He is thus easily manipulated.  He is prone to approach others to "have his own needs met."

Silver also testified that as an Asperger's patient defendant had impaired empathy for others and was inclined to manipulate others to meet his needs.  He tends to have narrow interests and engage in obsessive thinking.

Two inmates who became acquainted with defendant in Humboldt County Jail recounted statements made to them by Wallace to the effect that "in exchange for a deal" to drop his charges, he had "given the DA everything" they needed for a case against defendant. According to the defense witnesses, Wallace manipulated defendant through an "RPG," role-playing game, to get him to "say anything he wanted him to say."  The manipulation was accomplished through timed signals that "involved tattoos and hand signs," and

conveyed a message to defendant that prompted him to respond "on a wire" in the manner Wallace wanted.

People v. Larsen, 205 Cal. App. 4th 810, 814–22 (Cal. Ct. App. 2012).

### III.  DISCUSSION

A.      Standard of Review

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a); Rose v. Hodges, 423 U.S. 19, 21 (1975).

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") amended § 2254 to impose new restrictions on federal habeas review.  A petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  Additionally, habeas relief is warranted only if the constitutional error at issue had a "substantial and injurious effect or influence in determining the jury's verdict."  Penry v. Johnson, 532 U.S. 782, 795 (2001) (internal quotation marks omitted).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts."  Williams (Terry) v. Taylor, 529 U.S. 362, 412–13 (2000).  "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  Id. at 413.  "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable."  Id. at 411.  A federal habeas court making

9

United States District Court
Northern District of California

1   the "unreasonable application" inquiry should ask whether the state court's application of clearly

2   established federal law was "objectively unreasonable." Id. at 409.

3        Section 2254(d)(1) restricts the source of clearly established law to the Supreme Court's

4   jurisprudence. "[C]learly established Federal law, as determined by the Supreme Court of the

5   United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions

6   as of the time of the relevant state-court decision." Williams, 529 U.S. at 412. "A federal court

7   may not overrule a state court for simply holding a view different from its own, when the

8   precedent from [the Supreme Court] is, at best, ambiguous." Mitchell v. Esparza, 540 U.S. 12, 17

9   (2003).

10  B.    Instructional Error

11       Petitioner argues that the trial court erred in refusing to instruct the jury with California

12  Criminal Jury Instruction ("CALCRIM") No. 3428 (Mental Impairment: Defense to Specific

13  Intent or Mental State); refusing to instruct the jury on entrapment as to his father, Dennis Larsen;

14  and refusing to instruct the jury that Dennis's plea of no contest was not conclusive proof that

15  Petitioner was guilty of conspiracy.

16         1)    Standard

17       Due process requires that "'criminal defendants be afforded a meaningful opportunity to

18  present a complete defense.'" Clark v. Brown, 450 F.3d 898, 904 (9th Cir. 2006) (quoting

19  California v. Trombetta, 467 U.S. 479, 485 (1984)). Therefore, a criminal defendant is entitled to

20  adequate instructions on the defense theory of the case. Conde v. Henry, 198 F.3d 734, 739 (9th

21  Cir. 2000) (error to deny defendant's request for instruction on simple kidnapping where such

22  instruction was supported by the evidence). The defendant is not entitled to have jury instructions

23  raised in his or her precise terms where the given instructions adequately embody the defense

24  theory. See United States v. Del Muro, 87 F.3d 1078, 1081 (9th Cir. 1996); United States v.

25  Tsinnijinnie, 601 F.2d 1035, 1040 (9th Cir. 1979).

26       A state trial court's refusal to give an instruction does not by itself raise a ground

27  cognizable in a federal habeas corpus proceedings. Dunckhurst v. Deeds, 859 F.2d 110, 114 (9th

28  Cir. 1988). The error must so infect the trial that the defendant was deprived of the fair trial

1    guaranteed by the Fourteenth Amendment.  Id.

2          Whether a constitutional violation has occurred will depend upon the evidence in the case

3    and the overall instructions given to the jury.  See Duckett v. Godinez, 67 F.3d 734, 745 (9th Cir.

4    1995) (citing Cupp v. Naughten, 414 U.S. 141, 147 (1973) and Henderson v. Kibbe, 431 U.S. 145,

5    155 (1977)).  The question is "whether, under the instructions as a whole and given the evidence

6    in the case, the failure to give the requested instruction rendered the trial so fundamentally unfair

7    as to violate federal due process."  Id. at 746 (citing Cupp, 414 U.S. at 147).

8          The omission of an instruction is less likely to be prejudicial than a misstatement of the

9    law.  See Walker v. Endell, 850 F.2d 470, 475–76 (9th Cir. 1987) (citing Henderson, 431 U.S. at

10   154).  Thus, a habeas petitioner whose claim involves a failure to give a particular instruction

11   bears an "'especially heavy burden.'"  Villafuerte v. Stewart, 111 F.3d 616, 624 (9th Cir. 1997)

12   (quoting Henderson, 431 U.S. at 155).  The significance of the omission of such an instruction

13   may be evaluated by comparison with the instructions that were given.  Murtishaw v. Woodford,

14   255 F.3d 926, 971 (9th Cir. 2001) (quoting Henderson, 431 U.S. at 156).

15         A habeas petitioner is not entitled to relief unless the instructional error "'had substantial

16   and injurious effect or influence in determining the jury's verdict.'"  Brecht v. Abrahamson, 507

17   U.S. 619, 631 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)). The proper

18   question in assessing harm in a habeas case is, "'Do I, the judge, think that the error substantially

19   influenced the jury's decision?'"  O'Neal v. McAninch, 513 U.S. 432, 436 (1995).  If the court is

20   convinced that the error did not influence the jury, or had but very slight effect, the verdict and the

21   judgment should stand.  Id. at 437.  If, on the other hand, the court is not fairly assured that there

22   was no effect on the verdict, it must reverse.  Id.  In the "narrow circumstance" in which the court

23   is in "grave doubt" about whether the error had substantial and injurious effect or influence in

24   determining the jury's verdict, it must assume that the error is not harmless and the petitioner must

25   win.  Id. at 436, 438; see, e.g., id. at 436–44 (relief granted because record so evenly balanced that

26   conscientious judge in grave doubt as to harmlessness of error); Chambers v. McDaniel, 549 F.3d

27   1191, 1200–01 (9th Cir. 2008) (granting habeas relief based upon "grave doubt" as to

28   harmlessness of erroneous first-degree murder instruction on premeditation, where error went to

United States District Court
Northern District of California

11

"very heart of the case" and evidence against petitioner was not so great that it precluded a verdict of second-degree murder).

> 2)      Analysis – Mental Impairment Jury Instruction

Petitioner's defense to the crimes was that he lacked the intent to kill due to his Asperger's Syndrome.  He stated that the plans to kill Jane Doe were part of a role-playing game initiated and controlled by Wallace, and that Petitioner's participation in this game was due to his Asperger's Syndrome.  The trial court refused Petitioner's request for the mental impairment pinpoint instruction, CALCRIM No. 3428, stating that the evidence did not support the instruction. Petitioner claims that the failure to give CALCRIM No. 3428 deprived him of his right to present a defense and to due process.

The California Court of Appeal set forth the relevant legal standards and denied Petitioner's claim, finding that the trial court did not commit reversible error when it failed to instruct on mental disorder:

> I. The Trial Court's Failure to Give an Instruction on Mental Disorder.
>
> Defendant contends the trial court infringed on his constitutional right to present a defense based on his purported mental impairment caused by Asperger's Syndrome, and how it affected his perceptions and mental processes.  He claims the evidence of his mental disorder supported his defense that the detailed plans for Jane Doe's murder were part of an elaborate fantasy within the confines of a role-playing game.  He thus claims he lacked the intent to kill.  He argues the trial court infringed upon his right to present a mental impairment defense by refusing to give an instruction in the terms of CALCRIM No. 3428, which reads in pertinent part: "You have heard evidence that the defendant may have suffered from a mental (disease[,] / [or] defect[,]] / [or] disorder).  You may consider this evidence only for the limited purpose of deciding whether, at the time of the charged crime, the defendant acted [or failed to act] with the intent or mental state required for that crime.  [¶]  The People have the burden of proving beyond a reasonable doubt that the defendant acted [or failed to act] with the required intent or mental state [required for the charged crimes].... If the People have not met this burden, you must find the defendant not guilty of [the charged crimes]."
>
> The trial court refused defendant's request to give this instruction, ruling that "[t]here just simply isn't any evidence that [defendant] didn't have the mental capacity to form the mental—the specific intent or didn't form that."  Defendant maintains "the record did indeed contain evidence that he lacked the intent to kill and that his Asperger's Syndrome was relevant to that claim, and the court's refusal to instruct the jury with CALCRIM [No.] 3428 severely hampered the presentation of his defense," in contravention of his due process rights.

A. The Evidence to Support the CALCRIM No. 3428 Instruction.

Our inquiry into the trial court's obligation to give the requested CALCRIM No. 3428 instruction proceeds from the fundamental principle that a "defendant, upon proper request therefor, has a right to an instruction to direct the jury's attention to evidence from which a reasonable doubt of his guilt could be inferred."  (People v. Jeffers (1996) 41 Cal.App.4th 917, 924–925, 49 Cal.Rptr.2d 86.)  "The trial court has an 'obligation to instruct on defenses, ... and on the relationship of these defenses to the elements of the charged offense ...' where '[¶] ... it appears that the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense....' [Citations.]"  (People v. Wooten (1996) 44 Cal.App.4th 1834, 1848, 52 Cal.Rptr.2d 765.)  But, the court must "give a requested instruction concerning a defense only if there is substantial evidence to support the defense."  (People v. Moore (2002) 96 Cal.App.4th 1105, 1116, 117 Cal.Rptr.2d 715; see also People v. Pollock (2004) 32 Cal.4th 1153, 1176, 13 Cal.Rptr.3d 34, 89 P.3d 353.)  "[A] trial judge must only give those instructions which are supported by substantial evidence," and "has the authority to refuse requested instructions on a defense theory for which there is no supporting evidence."  (People v. Ponce (1996) 44 Cal.App.4th 1380, 1386, 52 Cal.Rptr.2d 422; see also People v. Curtis (1994) 30 Cal.App.4th 1337, 1355, 37 Cal.Rptr.2d 304.)  "[T]he court is not obliged to instruct on theories that have no evidentiary support."  (People v. Joiner (2000) 84 Cal.App.4th 946, 972, 101 Cal.Rptr.2d 270; see also People v. Breverman (1998) 19 Cal.4th 142, 162, 77 Cal.Rptr.2d 870, 960 P.2d 1094.)

Substantial evidence in this context "'is "evidence sufficient 'to deserve consideration by the jury,' not 'whenever any evidence is presented, no matter how weak.'" '[Citations.]"  (People v. Wilson (2005) 36 Cal.4th 309, 331, 30 Cal.Rptr.3d 513, 114 P.3d 758.)  "In determining whether the evidence is sufficient to warrant a jury instruction, the trial court does not determine the credibility of the defense evidence, but only whether 'there was evidence which, if believed by the jury, was sufficient to raise a reasonable doubt....' [Citations.]"  (People v. Salas (2006) 37 Cal.4th 967, 982–983, 38 Cal.Rptr.3d 624, 127 P.3d 40.)  "'"'The fact that the evidence may not be of a character to inspire belief does not authorize the refusal of an instruction based thereon.'"'  '[Citations.]  As an obvious corollary, if the evidence is minimal and insubstantial the court need not instruct on its effects."  (People v. Springfield (1993) 13 Cal.App.4th 1674, 1680, 17 Cal.Rptr.2d 278.)

"'"'Doubts as to the sufficiency of the evidence to warrant instructions should be resolved in favor of the accused."  [Citations.]'  [Citation.]  Even so, the test is not whether any evidence is presented, no matter how weak.  Instead, the jury must be instructed when there is evidence that 'deserve[s] consideration by the jury, i.e., "evidence from which a jury composed of reasonable [people] could have concluded"' that the specific facts supporting the instruction existed.  [Citations.]"  (People v. Petznick (2003) 114 Cal.App.4th 663, 677, 7 Cal.Rptr.3d 726.)  "We review this issue as one of law."  (People v. Sinclair (1998) 64 Cal.App.4th 1012, 1017, 75 Cal.Rptr.2d 626.)

The question, as it is "properly phrased" in CALCRIM No. 3428, "is 'whether the defendant actually formed the required specific intent.'"  (People v. Blacksher (2011) 52 Cal.4th 769, 832, 130 Cal.Rptr.3d 191, 259 P.3d 370.)  CALCRIM No. 3428 is a pinpoint instruction that must be given only if requested by the defendant, and only if substantial

United States District Court
Northern District of California

evidence supports the defense theory that defendant's mental disease or disorder affected the formation of the relevant intent or mental state.  (People v. Ervin (2000) 22 Cal.4th 48, 91, 91 Cal.Rptr.2d 623, 990 P.2d 506.)  Also, expert medical opinion testimony is necessary to establish that a defendant suffered from a mental disease, mental defect, or mental disorder within the meaning of CALCRIM No. 3428, because jurors cannot make such a determination from common experience.  (People v. Moore, supra, 96 Cal.App.4th 1105, 1116–1117, 117 Cal.Rptr.2d 715; People v. Musselwhite (1998) 17 Cal.4th 1216, 1229–1230, 1247–1249, 74 Cal.Rptr.2d 212, 954 P.2d 475; People v. Cox (1990) 221 Cal.App.3d 980, 987, 270 Cal.Rptr. 730.)

In the present case, Catherine Silver, a psychiatric physician's assistant, testified as an expert on the diagnosis and treatment of Asperger's Syndrome.  She was versed in psychiatric disorders, and had personal experience with both the diagnosis and treatment of defendant as an Asperger's patient.  Although the defense did not provide a foundation for a ruling that Silver was qualified as an expert, she testified in that capacity without objection from the prosecution.

We further conclude that Asperger's Syndrome is a recognized mental diagnosis that warrants a mental disorder instruction, at least in the context of the conspiracy and solicitation to commit murder charges faced by defendant presented here.[11]  Both conspiracy and solicitation require proof of the element that defendant had the specific intent to commit or effectuate commission of the alleged underlying offense, in this case murder.  (See People v. Superior Court (Decker ) (2007) 41 Cal.4th 1, 11, 58 Cal.Rptr.3d 421, 157 P.3d 1017; People v. Jurado (2006) 38 Cal.4th 72, 120, 41 Cal.Rptr.3d 319, 131 P.3d 400; People v. Herman (2002) 97 Cal.App.4th 1369, 1381–1382, 119 Cal.Rptr.2d 199; People v. Hall (2000) 83 Cal.App.4th 1084, 1094, 100 Cal.Rptr.2d 279.)  Solicitation as alleged may be complete when conversations occur, irrespective of any overt act committed by defendant to achieve the murder, or whether the object of the solicitation is ever actually undertaken or accomplished.  (People v. Superior Court, supra, at p. 11, 58 Cal.Rptr.3d 421, 157 P.3d 1017; People v. Wilson, supra, 36 Cal.4th 309, 328, 30 Cal.Rptr.3d 513, 114 P.3d 758; In re Ryan N. (2001) 92 Cal.App.4th 1359, 1377–1378, 112 Cal.Rptr.2d 620; People v. Fenenbock (1996) 46 Cal.App.4th 1688, 1708–1709, 54 Cal.Rptr.2d 608.)  Conspiracy, unlike solicitation, requires an agreement with another to commit or join in a feature of the alleged criminal object, along with an overt act in furtherance of the illegal objective.  (People v. Zamora (1976) 18 Cal.3d 538, 549, fn. 8, 134 Cal.Rptr. 784, 557 P.2d 75; People v. Tatman (1993) 20 Cal.App.4th 1, 10–11, 24 Cal.Rptr.2d 480.)  Yet the focus is on the agreement with at least one other person to participate in an offense and no additional steps need be taken by the defendant towards its completion.  (People v. Fenenbock, supra, at p. 1709, 54 Cal.Rptr.2d 608.)  It is immaterial that the object of either the solicitation or the conspiracy is never achieved.  (People v. Saephanh (2000) 80 Cal.App.4th 451, 460–461, 94 Cal.Rptr.2d 910.)  The intent with which statements are made, plans are discussed, and agreements are confirmed, therefore becomes crucially important to prove solicitation or conspiracy accusations where no subsequent acts are undertaken by the defendant.

   Fn 11.  "Asperger's Disorder is [defined as] an autism spectrum disorder characterized by a 'severe and sustained impairment in social interaction ... and the development of restricted, repetitive patterns of behavior, interests, and activities.' American Psychiatric Association, Diagnostic & Statistical Manual of Mental

Disorders 75 (4th ed. 1994) (DSM–IV; <u>see also</u> National Institute of Neurological Disorders and Stroke, Asperger Syndrome Fact Sheet, http://www.ninds.nih. gov/disorders/asperger/detail_asperger.htm [hereinafter NINDS, Fact Sheet]. Persons with Asperger's Disorder often exhibit 'socially and emotionally inappropriate behavior' and an 'inability to interact successfully with peers.' NINDS, Fact Sheet, <u>supra</u>. They have difficulty communicating with others and may not understand normal body language and gestures." (<u>State v. Burr</u> (2008) 195 N.J. 119, 123, fn. 2, 948 A.2d 627.)

Defendant's request for the mental disorder instruction was appropriate in light of the evidence presented in the case to support the solicitation and conspiracy charges. The primary testimony offered against defendant was derived from conversations he had with other inmates in the closed, coercive structure of incarceration. The essential issue presented by the defense evidence, and brought into focus by Silver's testimony, was defendant's mental state—specifically, whether he intended by his statements to effectuate the killing of Jane Doe, or instead was merely engaging in role playing and seeking to curry favor with other inmates.

Of course, Silver did not, and could not, offer an opinion that defendant's mental condition precluded him from entertaining the requisite intent for the charged offenses. Sections 28 and 29 prohibit "an expert from offering an opinion on the ultimate question of whether the defendant had or did not have a particular mental state at the time he acted." (<u>People v. Nunn</u> (1996) 50 Cal.App.4th 1357, 1364, 58 Cal.Rptr.2d 294.) "Expert opinion on whether a defendant had the capacity to form a mental state that is an element of a charged offense or actually did form such intent is not admissible at the guilt phase of a trial. [Citation.] Sections 28 and 29 permit introduction of evidence of mental illness when relevant to whether a defendant actually formed a mental state that is an element of a charged offense, but do not permit an expert to offer an opinion on whether a defendant had the mental capacity to form a specific mental state or whether the defendant actually harbored such a mental state." (<u>People v. Coddington</u> (2000) 23 Cal.4th 529, 582, fns. omitted, 97 Cal.Rptr.2d 528, 2 P.3d 1081, <u>overruled on unrelated grounds in</u> <u>Price v. Superior Court</u> (2001) 25 Cal.4th 1046, 1069, fn. 13, 108 Cal.Rptr.2d 409, 25 P.3d 618; <u>see also</u> <u>People v. Cortes</u> (2011) 192 Cal.App.4th 873, 902, 121 Cal.Rptr.3d 605.)

Nevertheless, Silver offered expert medical testimony that defendant was suffering from a mental disorder at the time of the commission of the crime, thereby providing an evidentiary basis for the CALCRIM No. 3428 instruction. She not only testified definitively that defendant had been diagnosed with Asperger's Syndrome, but also described defendant's disorder to include features pertinent to the effort of the defense to negate the intent element of the solicitation and conspiracy offenses: his lack of social or mental filters, inclination to make inappropriate comments, inordinate desire to please others, susceptibility to manipulation, obsessive thinking, and compulsive fascination with fantasy role playing to the exclusion of reality. Silver specifically testified that defendant is socially naïve and subject to manipulation by others to say things adverse to his own interests. Silver's opinion testimony on the effects of defendant's Asperger's Syndrome was both probative and admissible on the issue of whether defendant actually formed and expressed the requisite intent to procure Jane Doe's murder. (See <u>State v. Burr</u>, <u>supra</u>, 948 A.2d 627, 629; <u>State v. Boyd</u> (Mo.Ct.App.2004) 143 S.W.3d 36, 45–46.)

Defendant's testimony did not touch upon his mental condition, but somewhat substantiated the claim of lack of intent.  He testified that he was a social misfit who gravitated to an impulsive obsession with fantasy role playing to escape reality.  He denied that he intended to have Jane Doe killed, and asserted that his conversations with Wallace were all part of a role-playing fantasy game orchestrated by Wallace.  Even if the defense evidence of mental disorder and absence of intent may be classified as less than highly persuasive and was disputed by conflicting evidence—of, for instance, the detailed notes and plans drawn for Wallace, and incriminating conversations with other inmates that did not seem to implicate defendant's Asperger's Syndrome—the court does not measure the substantiality of the evidence by weighing conflicting evidence or the credibility of the witnesses.  (People v. Mentch (2008) 45 Cal.4th 274, 288, 85 Cal.Rptr.3d 480, 195 P.3d 1061; People v. Salas, supra, 37 Cal.4th 967, 982–983, 38 Cal.Rptr.3d 624, 127 P.3d 40; People v. Zamani (2010) 183 Cal.App.4th 854, 885, 107 Cal.Rptr.3d 608.)  "In deciding whether defendant was entitled to the instructions urged, we take the proffered evidence as true, 'regardless of whether it was of a character to inspire belief.  [Citations.]' [Citation.]" (People v. Petznick, supra, 114 Cal.App.4th 663, 677, 7 Cal.Rptr.3d 726.)

We point out that to justify the CALCRIM No. 3428 instruction the defense was not required to either offer the theory or present additional evidence that defendant's Asperger's Syndrome impaired his ability to form the requisite criminal intent to commit the crime of solicitation to commit murder or conspiracy to do the same.  The CALCRIM No. 3428 instruction, and sections 28 and 29, do not focus on whether a defendant had the mental capacity to form a specific intent, a prohibited inquiry in any event, but rather on "'whether a defendant actually formed a mental state that is an element of a charged offense.'"  (People v. Vieira (2005) 35 Cal.4th 264, 292, 25 Cal.Rptr.3d 337, 106 P.3d 990, quoting People v. Coddington, supra, 23 Cal.4th 529, 582, 97 Cal.Rptr.2d 528, 2 P.3d 1081.)  It is the actual formation of intent in light of the defendant's mental disorder, not the capability to do so, that is the fundamental inquiry posited by CALCRIM No. 3428.  (People v. Blacksher, supra, 52 Cal.4th 769, 832, 130 Cal.Rptr.3d 191, 259 P.3d 370.)  Thus, the trial court's announced finding, "There just simply isn't any evidence that [defendant] didn't have the *mental capacity*" to form the specific intent for the conspiracy and solicitation offenses, was off the mark.  (Italics added.)  The evidence that defendant suffered from Asperger's Syndrome, and its manifested symptoms, directly and materially reflected on his claim that he did not actually intend to solicit the victim's murder, but instead was engaged in some form of game-playing brought on by his mental disorder.

The concurring opinion argues there is a paucity of evidence defendant's diagnosed Asperger's syndrome precluded him from having specific intent.  We believe the evidentiary hurdle presented in the concurrence intrudes on the jury's function.  CALCRIM No. 3428 presents two fundamental points:  First, the jury is told "it has heard evidence the defendant may have suffered from a mental (disease[,] [or] defect[,] [or] disorder.)"  Second, the jury is advised it "may consider this evidence only for the limited purpose of deciding whether, at the time of the charged crime, the defendant acted [or failed to act] with the intent or mental state required for the crime."

Consequently, if there is evidence from a qualified expert the defendant suffered from a mental disease, defect or disorder at the time of the crime—as Silver testified here (i.e., that the defendant was treated since the seventh grade and suffered then and now from an autism spectrum disorder)—the particular mental disease, defect or disorder becomes a

16

matter for the jury to consider as that fact finder believes appropriate in deciding whether the defendant acted with the required mental state. Neither the language of CALCRIM No. 3428 nor any case, mandates, as the concurring opinion seems to argue, there must be expert evidence showing the defendant suffers from a mental disorder like Asperger's and that the identified mental disease, defect, or disorder "generally impairs criminal intent," or does so in a "hypothetical situation" like the one present in the case. Indeed, it may be the case that evidence of the latter sort—the "hypothetical situation"—would come dangerously close to the territory precluded by sections 28 and 29.[12]

> Fn 12. The concurring opinion discusses People v. Panah (2005) 35 Cal.4th 395, 25 Cal.Rptr.3d 672, 107 P.3d 790, where the Supreme Court decided the defendant was not entitled to CALJIC No. 3.32, an equivalent to CALCRIM No. 3428, because there was no testimony from a medical expert defendant was actually suffering from a mental condition at the time of the crime. In that case, an emergency room physician who treated defendant more than 24 hours after the victim's disappearance, noted the accused was psychotic and delusional. (Panah, supra, at pp. 484–485, 25 Cal.Rptr.3d 672, 107 P.3d 790.) The court noted there was no evidence of impairment when defendant assisted others in attempting to locate the missing victim before the ER visit. This was "at best" evidence defendant might suffer from some "long-standing latent psychosis," but there was no evidence, let alone by a medical expert, the defendant was actually suffering from any mental problem at the time of the offense. (Ibid.) Here, there was expert medical testimony that defendant, at the time of the crimes, was suffering from an ongoing and manifest mental disorder—Asperger's syndrome.

We conclude that the expert testimony of defendant's mental disorder of Asperger's Syndrome, in conjunction with the remaining evidence, was at least substantial on the issue of his actual formation of the specific mental state that is an element of the charged solicitation and conspiracy offenses. Therefore, the trial court erred by failing to give the CALCRIM No. 3428 mental disorder instruction. (People v. Musselwhite, supra, 17 Cal.4th 1216, 1229–1230, 1247–1249, 74 Cal.Rptr.2d 212, 954 P.2d 475; People v. Cox, supra, 221 Cal.App.3d 980, 987–988, 270 Cal.Rptr. 730; People v. Aguilar (1990) 218 Cal.App.3d 1556, 1569, 267 Cal.Rptr. 879, disapproved on other grounds in People v. Ervin, supra, 22 Cal.4th 48, 90–91, 91 Cal.Rptr.2d 623, 990 P.2d 506; People v. Molina (1988) 202 Cal.App.3d 1168, 1171, 249 Cal.Rptr. 273; People v. Young (1987) 189 Cal.App.3d 891, 907–909, 234 Cal.Rptr. 819.)

B. The Standard of Prejudicial Error.

We turn our inquiry to the prejudicial effect of the error. Our first task is to determine the applicable test of prejudicial error. Defendant asserts that the court's failure to give the mental disorder instruction "infringed his Fourteenth Amendment due process right to present a defense" by preventing a "fair jury evaluation" of his mental impairment claim, and thus the governing test of prejudicial error is whether the error was harmless beyond a reasonable doubt. (Chapman v. California (1967) 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (Chapman).)

Existing case law fails to support defendant's position. The California Supreme Court has directly declared, although without thorough discussion, that the error must be evaluated

under the much less stringent standard of People v. Watson (1956) 46 Cal.2d 818, 836, 299 P.2d 243 (Watson).  (People v. Ervin, supra, 22 Cal.4th 48, 91, 91 Cal.Rptr.2d 623, 990 P.2d 506; see also People v. San Nicolas (2004) 34 Cal.4th 614, 663, 21 Cal.Rptr.3d 612, 101 P.3d 509; People v. Coddington, supra, 23 Cal.4th 529, 583–584, 97 Cal.Rptr.2d 528, 2 P.3d 1081, People v. Cortes, supra, 192 Cal.App.4th 873, 912, 121 Cal.Rptr.3d 605.)

Upon analysis we agree that the Watson standard of review is appropriate to evaluate the instructional error at issue here.  "Any 'misdirection of the jury' (Cal. Const., art. VI, § 13), that is instructional error [citation], cannot be the basis of reversing a conviction unless '"an examination of the entire cause, including the evidence,"' indicates that the error resulted in a '"miscarriage of justice."'  [Citation.]"  (People v. Canizalez (2011) 197 Cal.App.4th 832, 858, 128 Cal.Rptr.3d 565.)  A distinction is drawn "between instructional error that entirely precludes jury consideration of an element of an offense and that which affects only an aspect of an element."  (People v. Cummings (1993) 4 Cal.4th 1233, 1315, 18 Cal.Rptr.2d 796, 850 P.2d 1.)  An instructional error that relieves the prosecution of the burden of proving beyond a reasonable doubt each essential element of the charged offense, or that improperly describes or omits an element of an offense, violates the defendant's rights under both the United States and California Constitutions, and is subject to Chapman review.  (Neder v. United States (1999) 527 U.S. 1, 4, 119 S.Ct. 1827, 144 L.Ed.2d 35; People v. Mil (2012) 53 Cal.4th 400, 409, 135 Cal.Rptr.3d 339, 266 P.3d 1030; People v. Chun (2009) 45 Cal.4th 1172, 1201, 91 Cal.Rptr.3d 106, 203 P.3d 425; People v. Cox (2000) 23 Cal.4th 665, 676–677, 97 Cal.Rptr.2d 647, 2 P.3d 1189; People v. Flood (1998) 18 Cal.4th 470, 479–480, 502–503, 76 Cal.Rptr.2d 180, 957 P.2d 869; People v. Jensen (2003) 114 Cal.App.4th 224, 241, 7 Cal.Rptr.3d 609.)  "If conflicting instructions on the mental state element of an alleged offense can act to remove that element from the jury's consideration, the instructions constitute a denial of federal due process and invoke the Chapman 'beyond a reasonable doubt' standard for assessing prejudice."  (People v. Maurer (1995) 32 Cal.App.4th 1121, 1128, 38 Cal.Rptr.2d 335.)  In contrast, "misdirection of the jury, including incorrect, ambiguous, conflicting, or wrongly omitted instructions that do not amount to federal constitutional error are reviewed under the harmless error standard articulated" in Watson.  (People v. Campos (2007) 156 Cal.App.4th 1228, 1244, 67 Cal.Rptr.3d 904; People v. Palmer (2005) 133 Cal.App.4th 1141, 1157, 35 Cal.Rptr.3d 373.)[13]

> Fn 13.  The argument by defendant regarding "structural error," urged here, is inapplicable.  "An error is '"structural," and thus subject to automatic reversal, only in a "very limited class of cases,"' such as the complete denial of counsel, a biased decision maker, racial discrimination in jury selection, denial of self-representation at trial, denial of a public trial, and a defective reasonable-doubt instruction.  [Citation.]  What unites this class of errors is 'a "defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself." ... Put another way, these errors deprive defendants of "basic protections" without which "a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence ... and no criminal punishment may be regarded as fundamentally fair."'  [Citation.]"  (People v. Mil, supra, 53 Cal.4th 400, 410, 135 Cal.Rptr.3d 339, 266 P.3d 1030.)  No such structural error occurred in the present case.

Here, the court's omission of the CALCRIM No. 3428 instruction did not remove from the

18

jury's consideration or incorrectly define the intent element of the offenses.  The jury received the necessary instructions that correctly stated the specific intent element of the solicitation and conspiracy offenses—an intent to kill the victim—and was advised to consider and evaluate expert opinion testimony.  The intent to prove murder was also defined for the jury.  Moreover, defendant was not denied the opportunity to present expert testimony and argument on the effect of his Asperger's Syndrome on the intent element of the offenses.  The defense did not challenge any other instructions at trial.

Nothing in the missing CALCRIM No. 3428 instruction resulted in a misstatement of the intent element of the offenses.  CALCRIM No. 3428 does not delineate or describe an element of an offense.  Rather, it is a pinpoint instruction relating particular facts to a legal issue in the case.  (People v. Saille (1991) 54 Cal.3d 1103, 1119, 2 Cal.Rptr.2d 364, 820 P.2d 588.)  As such it does not involve a "'general principle of law'" as that term is used in cases that impose a sua sponte duty of instruction on the trial court.  (Id. at p. 1120, 2 Cal.Rptr.2d 364, 820 P.2d 588; see also People v. San Nicolas, supra, 34 Cal.4th 614, 669–670, 21 Cal.Rptr.3d 612, 101 P.3d 509; and see People v. Jennings (2010) 50 Cal.4th 616, 674–675, 114 Cal.Rptr.3d 133, 237 P.3d 474.)  Instead, it draws the jury's attention to specific evidence that highlights the actual effect of a defendant's mental disorder on his relevant mental state.  (People v. Ervin, supra, 22 Cal.4th 48, 91, 91 Cal.Rptr.2d 623, 990 P.2d 506.)  Erroneous failure to give a pinpoint instruction is reviewed for prejudice under the Watson harmless error standard.  (People v. Ervin, supra, at p. 91, 91 Cal.Rptr.2d 623, 990 P.2d 506; People v. Fudge (1994) 7 Cal.4th 1075, 1111–1112, 31 Cal.Rptr.2d 321, 875 P.2d 36; People v. Wharton (1991) 53 Cal.3d 522, 571, 280 Cal.Rptr. 631, 809 P.2d 290; People v. King (2010) 183 Cal.App.4th 1281, 1317, 108 Cal.Rptr.3d 333.)

Reversal of a conviction in consequence of this form of instructional error is warranted only if, "'"after an examination of the entire cause, including the evidence" (Cal.Const., art. VI, § 13), it appears "reasonably probable" the defendant would have obtained a more favorable outcome had the error not occurred [citation].'  [Citation.]  The question is not what a jury could have done, but what a jury would likely have done if properly instructed."  (People v. Reeves (2001) 91 Cal.App.4th 14, 53, 109 Cal.Rptr.2d 728, quoting People v. Breverman, supra, 19 Cal.4th 142, 177, 178, 77 Cal.Rptr.2d 870, 960 P.2d 1094.)  "'In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so relatively strong, and the evidence supporting a different outcome is so comparatively weak, that there is no reasonable probability the error of which the defendant complains affected the result.' [Citation.]"  (People v. Russell (2006) 144 Cal.App.4th 1415, 1432, 51 Cal.Rptr.3d 263.)  We also consider the instructions as a whole, the jury's findings, and the closing arguments of counsel.  (People v. Cain (1995) 10 Cal.4th 1, 35–36, 40 Cal.Rptr.2d 481, 892 P.2d 1224; People v. Eid (2010) 187 Cal.App.4th 859, 883, 114 Cal.Rptr.3d 520.)

C. Evaluation of the Prejudicial Impact of the Instructional Error.

In our assessment of the prejudicial impact of the error, we start with awareness that defendant's intent was the crucial issue in the case.  And, as we have observed, the described symptoms of his mental disorder were imperative to the evaluation of the intent associated with his statements that established the solicitation and conspiracy offenses.  The pinpoint instruction went to the heart of the lack of intent defense.

The court's evidentiary rulings and instructions did not, however, suggest that the defense evidence of mental disorder was irrelevant to the issue of intent. The instructions required the jury to find beyond a reasonable doubt, upon consideration of all of the evidence presented, that the specific intent to facilitate commission of the murder was established. The jury was admonished to consider Silver's opinion, determine its "meaning and importance," and evaluate the credibility of her testimony in accordance with the "instructions about the believability of witnesses generally." A specific admonition was given to the jury that defendant's testimony was not to be ignored or disbelieved merely because of his mental impairment. The instructions when viewed as a whole adequately informed the jury that it could consider the evidence of defendant's mental disease or defect in deciding whether the People had carried their burden of proving the mental elements of conspiracy and solicitation beyond a reasonable doubt. (See People v. Musselwhite, supra, 17 Cal.4th 1216, 1249, 74 Cal.Rptr.2d 212, 954 P.2d 475.)

The defense was essentially given the opportunity to both present expert opinion testimony on mental disorder and intent, and use the testimony to attempt to negate proof of the intent element of the crimes. During closing argument defense counsel emphasized defendant's lack of restraint, his fixation with imaginary, fantastical plots, and his role playing with Wallace. The theme in defendant's comic book that mimicked the plan of binding the victim with "three ties" and burying him in an "oval hole" was mentioned by defense counsel to support the role-playing theory. Defense counsel also stressed the court's instruction that defendant's "developmental disability" or "mental impairment" did not weaken his credibility as a witness.

Silver's testimony was emphasized by the defense during closing argument. Defense counsel pointed out that Silver treated and diagnosed defendant with Asperger's Syndrome in 2007, before the solicitation and conspiracy occurred, so the mental disorder claim was not concocted disingenuously to "develop a defense." Counsel thoroughly summarized the expert's explanation of Asperger's Syndrome symptoms, and asserted that the diagnosis by Silver revealed defendant as a person "susceptible to somebody that could manipulate if they were able to tap into his fantasy, his role playing." Finally, counsel argued that the flawed, illogical nature of the detailed murder plot as described by Wallace was "consistent" with Silver's description of defendant's unreal behavior and role playing. Defense counsel's argument reinforced the concept that defendant's mental disorder provided a basis to find that he did not intend the killing of Jane Doe.

While the prosecutor exhibited an inappropriately cavalier and even demeaning attitude by referring to the "Asperger's Syndrome" defense as "insulting," and advised the jury to consider Silver's testimony that defendant was "bright" and "manipulative," neither the prosecutor's argument nor the refusal to give the CALCRIM No. 3428 instruction eviscerated the defense based on mental disorder and lack of intent.[14] Silver's testimony was admitted, and the jury was told to evaluate her expert testimony in the same manner as any other evidence. Unlike other cases in which prejudicial error has been found, defendant was not prevented from offering expert testimony to support the primary defense that his affliction with Asperger's Syndrome impaired his ability to formulate the intent to commit the offenses. (Cf. People v. Cortes, supra, 192 Cal.App.4th 873, 912–913, 121 Cal.Rptr.3d 605.) The sole impact of the instructional omission was the lack of specific directive to the jury to consider the expert testimony for the limited purpose of deciding whether, at the time of the charged crime, the defendant acted with the intent or mental

state required for the solicitation and conspiracy offenses. To be sure, the omission of a CALCRIM No. 3428 instruction deprived defendant of singular, distinctive focus on the expert testimony, but it did not leave the jurors with the misconception that they must in any way discount either Silver's testimony or the Asperger's Syndrome defense. Nothing in the instructions or argument precluded the jury from at least assessing the mental disorder evidence—and specifically the expert testimony—on the issue of intent.

> Fn 14.  The prosecutor also told the jury that the instruction on defendant's mental disorder and evaluation of his credibility did not mean "that he shouldn't be held accountable."

The evidence that defendant intended to enter into a conspiracy with his father to carry out the murder of Jane Doe is particularly strong.  The conspiracy charge as presented by the prosecution was based exclusively on defendant's discussions and plot with his father, not Wallace.  Thus, the connection between the symptoms of defendant's Asperger's Syndrome and the evidence of intent to commit the charged conspiracy was not at all persuasive, and the evidence of guilt was compelling.

The solicitation-to-commit-murder conviction necessitates a slightly different analysis due to the distinct nature of the offense and the associated implications of the error.  Evidence of solicitation may be derived entirely from conversations, without evidence of any accompanying agreement or overt act in furtherance of the crime by anyone.  "The essence of criminal solicitation is an attempt to induce another to commit a criminal offense." (People v. Herman, supra, 97 Cal.App.4th 1369, 1381, 119 Cal.Rptr.2d 199.)  For solicitation, the crime is complete when the request is made; the harm is in the asking, and no further acts toward commission of the target crime need occur.  (People v. Morante (1999) 20 Cal.4th 403, 420, 84 Cal.Rptr.2d 665, 975 P.2d 1071; People v. York (1998) 60 Cal.App.4th 1499, 1503, 71 Cal.Rptr.2d 303; People v. Miley (1984) 158 Cal.App.3d 25, 33, 204 Cal.Rptr. 347.)  Thus, proper and focused evaluation of the intent behind defendant's conversations was more essential and probative to the defense of the solicitation charge.

The solicitation charge also focused on Wallace; he was the solicited party.  His discussions with defendant formed the basis of the offense, and at the same time were the focal point for the defense evidence of the effect of Asperger's Syndrome on defendant's intent underlying his conversations with Wallace.  Thus, the CALCRIM No. 3428 instruction was more important to the defense to direct and assure the jury's proper evaluation of the evidence of role-playing and manipulation caused by defendant's Asperger's Syndrome as related to the solicitation offense.

Nevertheless, in light of the overall strength of the evidence concerning guilt of both offenses, the nature of the argument presented, and the other instructions given to the jury, a verdict more favorable to defendant would not likely have been reached with a CALCRIM No. 3428 instruction.  The evidence of defendant's guilt was not only quite forceful, much of it was unrelated to manifestations of his Asperger's Syndrome. The numerous and detailed discussions, plans, maps, and drawings, the procurement of equipment, the strategy expressed by defendant to strap and compact the intended victim for placement in a cement-filled trough, and the payments made by defendant's father to several inmates, convincingly established that defendant pursued a serious scheme with his

father and Wallace to have Jane Doe killed.  The tape-recorded conversations do not reveal any exploitation of defendant by Wallace, but rather a meticulous plot concocted by defendant to dispose of Jane Doe.  Testimony that defendant expressed a fervent motive and interest in dispatching the sole witness in his pending criminal case came from a host of inmate witnesses in addition to Wallace, most of whom had little or no connection with the role playing and manipulation that may have characterized defendant's relationship with Wallace or his father.  Defendant's strong motive and desire to kill Jane Doe was derived from the circumstances he faced, not his mental disorder.  Finally, Silver did not testify that defendant's Asperger's Syndrome precluded or even affected his intent to conspire with his father or solicit others to procure the murder of Jane Doe, only that defendant was naïve, easily influenced, obsessive, and subject to prolonged bouts of fantasy in his discussions with others.  (People v. Coddington, supra, 23 Cal.4th 529, 584, 97 Cal.Rptr.2d 528, 2 P.3d 1081.)

We therefore conclude that the trial court's failure to deliver a pinpoint instruction directing the jury's attention to the expert testimony of Asperger's Syndrome, while error, does not require reversal of the conspiracy or solicitation convictions.  (See People v. Ervin, supra, 22 Cal.4th 48, 91, 91 Cal.Rptr.2d 623, 990 P.2d 506; People v. Fudge, supra, 7 Cal.4th 1075, 1111–1112, 31 Cal.Rptr.2d 321, 875 P.2d 36.)

Larsen, 205 Cal. App. 4th at 822–34.

Petitioner claims that it is reasonably likely that without the pinpoint instruction the jury believed that Petitioner's mental impairment could not be used to negate the formation of the necessary mental state.  The record does not support Petitioner's claim.  As the California appellate court correctly notes, the instructions given did not misstate the law, nor did they prevent the jurors from considering Petitioner's mental impairment defense.  Larsen, 205 Cal. App. 4th at 830.  The jury instructions clearly stated that the prosecution needed to prove that Petitioner intended for murder to be committed, both for the conspiracy charge and the solicitation charge.  RT at 2162 and 2164–65.  The jury instructions also acknowledged Petitioner's mental impairment defense by instructing the jurors that they should not discount the testimony of a person with a cognitive or mental impairment solely because of the disability or impairment, id. at 2155–56, and by instructing the jurors how they should evaluate the expert testimony on Asperger's Syndrome that had been provided by Catherine Silver, id. at 2156.   In addition, Petitioner was able to present a defense emphasizing his mental impairment.  Silver testified that Petitioner's Asperger's Syndrome pre-dated his criminal offenses, id. at 1801–02, that Petitioner was susceptible to manipulation and eager to please others, id. at 1809–10, and that Petitioner regularly engaged in role-playing games, id. at 1808–09.  Petitioner testified at length about his

22

United States District Court
Northern District of California

involvement in role-playing games, id. at 1577–95; role playing with Wallace, id. at 1601–05, 1612–15, and 1650–70; and how the alleged plot to kill Jane Doe was merely a role-playing game based upon plots in his favorite comic books, id. at 1690–99.  The testimony presented and the jury instructions both afforded Petitioner a meaningful opportunity to present his defense that his Asperger's Syndrome made it likely that he had been participating in a role-playing game and did not have the necessary intent for conspiracy or solicitation to commit murder.  Petitioner has not shown that the omission of a pinpoint jury instruction on mental disorder had a substantial and injurious effect or influence in determining the jury's verdict.  Brecht, 507 U.S. at 647.  Accordingly, the state court decision rejecting Petitioner's claim was not contrary to, or an unreasonable application of, clearly established federal law.  See Duckett, 67 F.3d at 745.

Moreover, there was no prejudicial error under Brecht.  As the California appellate court noted, there was significant evidence of Petitioner's guilt, unrelated to manifestations of his Asperger's Syndrome.  Other inmates who were not engaged in role-playing games with Petitioner testified that Petitioner had solicited their assistance in killing Jane Doe.  RT at 647–51, 714, 733.  There were detailed plans and drawings related to the plot created by Petitioner.  Petitioner's father purchased shovels, suspecting that the shovels were to be used to cover up the killing of Jane Doe.  RT at 835, 838.  The state court denial of this claim was a reasonable determination of the facts in light of the evidence presented in the state court proceedings.

3)      Analysis – Entrapment Jury Instruction

Petitioner argues that he was entitled to a jury instruction on whether Dennis was entrapped and to a corresponding direction that if Dennis was found not guilty of conspiracy by reason of having been entrapped, then the jury should find Petitioner not guilty.

The California Court of Appeal denied Petitioner's claim as follows:

III.  The Failure to Give an Entrapment Instruction

Defendant contends he was entitled to a jury instruction on the issue whether *Dennis*, not defendant was entrapped.  His reasoning appears to be that (1) if Dennis were entrapped, and therefore innocent of any conspiracy, then (2) defendant's conspiracy conviction must fail because there cannot be only one conspirator in a conspiracy case.

In a hypothetical setting, defendant's argument provides some food for thought.  It is true

that an entrapped defendant must be acquitted.  (CALCRIM No. 3408; see <u>Sherman v.</u> <u>United States</u> (1958) 356 U.S. 369, 380 [2 L.Ed.2d 848, 78 S.Ct. 819]; <u>People v. Barraza</u> (1979) 23 Cal.3d 675, 686−687 [153 Cal.Rptr. 459, 591 P.2d 947] (<u>Barraza</u>).)  Normally the entrapment defense cannot be asserted vicariously (<u>People v. Holloway</u> (1996) 47 Cal.App.4th 1757, 1767 [55 Cal.Rptr.2d 547], <u>overruled on unrelated grounds in</u> <u>People v.</u> <u>Fuhrman</u> (1997) 16 Cal.4th 930, 947, fn. 11 [67 Cal.Rptr.2d 1, 941 P.2d 1189]), and assuming hypothetically that Dennis, although no longer a defendant, enjoyed the status of innocence due to entrapment, then the case would lack two wrongdoing conspirators necessary for a conspiracy (§ 182, subd. (a)(1); <u>People v. Morante</u>, <u>supra</u>, 20 Cal.4th 403, 416).  This would render highly suspect, if not invalid, defendant's conspiracy conviction.  Thus, hypothetically, defendant's reasoning tastes of a certain logic.

But "Things sweet to taste prove in digestion sour."  (Shakespeare, Richard II, act I, scene 3.)  Defendant's argument fails on the facts, for three reasons.

First, Dennis cannot be considered an innocent party because he pleaded no contest to solicitation of murder in the context of this case.  His plea amounted to a plea of guilty (4 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Pretrial Proceedings, § 260, pp. 468−469) and thus amounts to an admission of all the elements of the offense of soliciting Jane Doe's murder.  (<u>Id</u>. at § 259, p. 467; <u>People v. Chadd</u> (1981) 28 Cal.3d 739, 748 [170 Cal.Rptr. 798, 621 P.2d 837].)  Dennis testified that he pleaded no contest to solicitation of murder.  Dennis having admitted his complicity in that offense, it would have confused the jury to put before them the question of his entrapment and paint a potential picture of his innocence.

Second, there is no evidence that Dennis was entrapped.  The test for entrapment is well known:  "was the conduct of the law enforcement agent likely to induce a normally law-abiding person to commit the offense?"  (<u>Barraza</u>, <u>supra</u>, 23 Cal.3d 675, 689−690.) "Official conduct that does no more than offer an opportunity to the suspect—for example, a decoy program—is therefore permissible; but it is impermissible for the police or their agents to pressure the suspect by overbearing conduct such as badgering, cajoling, importuning, or other affirmative acts likely to induce a normally law-abiding person to commit the crime."  (<u>Id</u>. at p. 690.)

Certainly, Wallace's wearing of a recording device at the behest of the investigators does not amount to entrapment.  And as the Supreme Court pointed out, the use of decoys, such as the phone calls from the probation officer posing as "Carl," is permissible conduct not rising to the overbearing behavior necessary for an entrapment finding.  (See, <u>e.g.</u>, <u>Provigo</u> <u>Corp. v. Alcoholic Beverage Control Appeals Board</u> (1994) 7 Cal.4th 561, 568−570 [28 Cal.Rptr.2d 638, 869 P.2d 1163]; <u>People v. Graves</u> (2001) 93 Cal.App.4th 1171, 1177−1178 [113 Cal.Rptr.2d 708]; Judicial Council of Cal., Crim. Jury Instns. (2012) Related Issues to CALCRIM No. 3408, p. 1015.)

Third, although the record could be clearer, Dennis went along with defendant's plans to murder Jane Doe.  He provided cash payments to defendant's fellow inmates (although Dennis's self-serving testimony offered up an innocent explanation for the payments).  Dennis went along with defendant's instructions on June 12, 2008, to give Carl $500.  Dennis did so even though he thought defendant was setting up a hit on Jane Doe.  Dennis may have seen other notes referring to detailed plans for the conspiracy, including a

reference to "fix[ing]" defendant's "problem." Once he received calls from someone he thought was defendant's friend Wallace, Dennis went to a hardware store as instructed and bought shovels—despite his belief that defendant was planning a hit on Jane Doe through his agent, Wallace. While he may have later had second thoughts, Dennis was a willing partner in defendant's conspiracy.

Exhibit G at 27–29.

Due process does not require that an instruction be given unless the evidence supports it. See Hopper v. Evans, 456 U.S. 605, 611 (1982). The state court reasonably concluded that the evidence did not support a jury instruction on whether Dennis was entrapped. Under California law, as explained by the court of appeal, the test for determining entrapment is whether the acts of the law enforcement agent are "likely to induce a normally law-abiding person to commit the offense." People v. Barraza, 23 Cal. 3d 675, 689–90 (Cal. 1979). Dennis suspected that Petitioner was setting up a hit on Jane Doe, RT at 835, but still followed Wallace's directions and provided shovels and $500 to Wallace, RT at 838 and 840. In addition, Dennis testified that he entered a plea of nolo contendere (no contest plea) to solicitation of murder in the context of this case. RT at 851. Under California law, "the legal effect of [nolo contendere] plea . . . shall be the same as that of a plea of guilty for all purposes." Cal. Penal Code § 1016(3); see also United States v. Anderson, 625 F.3d 1219, 1220 (9th Cir. 2010) ("a plea of nolo contendere is the functional equivalent of a guilty plea") (internal quotation marks omitted). The evidence does not support a jury instruction on whether Dennis was entrapped. Petitioner has therefore failed to demonstrate that the state court's denial of this claim was either an unreasonable application of federal authority or on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. This claim is denied.

4)      Analysis – Instruction Regarding Dennis's Guilty Plea

Petitioner argues that the trial court should have instructed that, as a matter of law, the fact that Dennis pled guilty to one count of solicitation of murder was not conclusive evidence that Dennis had actually solicited murder and that even if the jury found that Dennis had solicited murder, this did not require the jury to conclude that Dennis was also guilty of conspiracy to commit murder.

The California Court of Appeal denied Petitioner's claim as follows:

IV.  The Failure to Give an Instruction on Dennis's Plea.

Defendant argues that the trial court should have sua sponte instructed the jury that Dennis's no contest plea to solicitation is not conclusive proof that he was guilty of conspiracy.[16]  Apparently still following the notion that there must be at least two conspirators, defendant claims the trial court should have told the jury the no contest plea was not a conclusive admission that he actually committed the offense, and also did not require the jury to conclude that Dennis was guilty of conspiracy.

> FN 16:  In their respondent's brief, the People content that the defendant never asked for such an instruction.  Defendant does not dispute this assertion.

In the first place, defendant's opening brief fails to apply the standards for when a trial court should give a sua sponte instruction.  In the second place, defendant's argument is difficult to follow because he cites *civil* cases for the principle that a no contest plea is not a conclusive admission in a subsequent civil case.  (See, e.g., Rusheen v. Drews (2002) 99 Cal. App. 4th 279, 284 [120 Cal. Rptr.2d 769].)  But for purposes of criminal proceedings, Dennis's no contest plea was an admission of each and every offense of the charge of solicitation of murder.  In any case, the issue is tangential.  The argument that the jury should have been told that a plea to solicitation does not imply guilt of another offense, i.e. conspiracy, overlooks the evidence that clearly shows Dennis participated in a conspiracy. Finally, the ultimate issue was the guilt or innocence of *defendant*, on which the jury was adequately instructed.

Exhibit G at 29–30.

The state appellate court's denial of this claim was a reasonable determination of the facts in light of the evidence presented in the state court proceedings.  As discussed above in Section B.3, Dennis pled guilty to solicitation of murder and the evidence supported a finding that Dennis participated in the conspiracy.  Nor was the state appellate court's denial of this claim an unreasonable application of federal authority.  Due process entitles a defendant to adequate instructions on the defense theory of the case.  See Conde, 198 F.3d at 739.  As the state appellate court pointed out, the ultimate issue was the guilt or innocence of the defendant.  The defense theory of the case was that Petitioner's plot to kill Jane Doe was purely imaginary and was part of a role-playing game initiated and controlled by Wallace.  As discussed above in Section B.2, the jury was adequately instructed on the defense theory of the case.

Finally, the failure to instruct the jury that Dennis's no contest plea to solicitation did not imply that Dennis was guilty of conspiracy did not result in prejudicial error under Brecht.  There was evidence that Dennis had engaged in a conspiracy and that Petitioner intended to kill Jane

1    Doe.  Dennis suspected that Petitioner was setting up a hit on Jane Doe, but still followed

2    Wallace's directions and provided shovels and $500 to Wallace.  Petitioner had previously

3    solicited other inmates to kill Jane Doe and there were detailed drawings and plans regarding the

4    plot.  This claim is denied.

5         C.    Evidentiary Error

6         Petitioner argues that the trial court erred by excluding certain defense evidence relevant to

7    his mental impairment.

8              1)    Standard

9         "[S]tate and federal rulemakers have broad latitude under the Constitution to establish rules

10   excluding evidence from criminal trials."  Holmes v. South Carolina, 547 U.S. 319, 324 (2006)

11   (alternation in original and internal quotation marks omitted); see also Montana v. Egelhoff, 518

12   U.S. 37, 42 (1996) (holding that due process does not guarantee a defendant the right to present all

13   relevant evidence).  This latitude is limited, however, by a defendant's constitutional rights to due

14   process and to present a defense, rights originating in the Sixth and Fourteenth Amendments.  See

15   Holmes, 547 U.S. at 324.  "While the Constitution . . . prohibits the exclusion of defense evidence

16   under rules that serve no legitimate purpose or that are disproportionate to the ends that they are

17   asserted to promote, well-established rules of evidence permit trial judges to exclude evidence if

18   its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the

19   issues, or potential to mislead the jury."  Id. at 325–26; see Egelhoff, 518 U.S. at 42 (holding that

20   the exclusion of evidence does not violate the Due Process Clause unless "it offends some

21   principle of justice so rooted in the traditions and conscience of our people as to be ranked as

22   fundamental").  But "at times a state's rules of evidence cannot be mechanistically applied and

23   must yield in favor of due process and the right to a fair trial."  Lunbery v. Hornbeak, 605 F.3d

24   754, 762 (9th Cir. 2010) (finding California's application of its evidentiary rules to exclude

25   hearsay testimony that bore persuasive assurances of trustworthiness and was critical to the

26   defense violated right to present evidence).  The defendant, not the state, bears the burden to

27   demonstrate that the principle violated by the evidentiary rule "is so rooted in the traditions and

28   conscience of our people as to be ranked as fundamental."  Egelhoff, 518 U.S. at 47 (internal

United States District Court
Northern District of California

27

quotation marks omitted).

2)     Analysis

The California Court of Appeal denied Petitioner's claim as follows:

II.  The Exclusion of Mental Impairment Defense Evidence.

Defendant also contends the trial court infringed upon his right to present a mental impairment defense by sustaining relevance objections to five areas of inquiry during defense counsel's cross-examination of the People's witnesses:

(1) Questioning jail inmate Lenard about whether inmates knew Schwartz was a recruiter for the Aryan Brotherhood;

(2) Questioning inmate Ekker about whether he saw inmates trying to take advantage of defendant, whether Wallace was a threatening person in jail, and whether Ekker saw any such threatening behavior;

(3) Questioning a district attorney's investigator whether it became apparent to him during the course of his investigation that defendant may have psychological problems;

(4) Questioning Wallace about whether he felt defendant had psychological difficulties; and

(5) Questioning defendant about whether his teachers sent him to counseling while he was in school, whether he was receiving social security income on the recommendation of his therapist, whether he was given medication when he started going to counseling, and whether he had learning problems in high school.[15]

> FN 15:  The People's objection to the question about learning problems in high school was overruled, but part of defendant's answer was stricken as nonresponsive.

Defendant contends the relevance objections to (1) and (2) should have been overruled because the answers would have shown that there were inmates, especially a recruiter for a White supremacist group, who might have manipulated him in jail.  He contends that the objections to (3) and (4) should have been overruled because the answers could have shown his psychological disabilities were evident to those around him.  He contends the objection to (5) should have been overruled because the answers would have shown the long-standing impairment of his condition and that the fact it required medication and counseling.

We believe the objections were properly sustained to the questions as phrased.  Whether certain inmates could have threatened defendant, or saw him as someone with psychological disabilities, has at best a tenuous connection to the issue of defendant's mental state for the charged crimes.  So, too, do the matters excluded in defendant's own testimony, relatively minor matters such as social security income and medication.  And even if the matters excluded in (1) through (5) were relevant, the trial court was within its

28

discretion to exclude them under Evidence Code 352 as being less probative of the issues than confusing and unduly time consuming.  Moreover, the jury was able to consider Silver's and defendant's testimony about his Asperger's Syndrome and the effect of his condition on his perceptions and behavior.  No error in the exclusion of the proffered testimony was committed by the trial court.

Exhibit G at 26–27.

Petitioner's defense was that Wallace deliberately set up Petitioner in order to reduce Wallace's sentence; Petitioner's Asperger's Syndrome made him especially susceptible to manipulation by Wallace; and the plot to kill Jane Doe was merely part of an elaborate role-playing game using the plots from comic books and details from Petitioner's life.  The trial court reasonably excluded evidence regarding whether other inmates might have manipulated Petitioner and evidence regarding Ekker's impression of Wallace as having a tenuous connection to the issue of Petitioner's mental state and as more confusing than probative.  Petitioner's manipulation by and fear of other inmates — and even of Wallace — does not preclude Petitioner from forming the intent to kill Jane Doe and plotting to achieve that goal.  Similarly, the fact that his psychological disabilities were evident to those around him and that his Asperger's Syndrome condition dates back to his childhood do not mean he could not form the intent to kill Jane Doe.  This claim is denied.

D.    Recusal Error

Petitioner argues that the Humboldt County District Attorney's Office had an actual conflict of interest and that the trial court therefore erred in denying his post-verdict, pre-sentencing motion to recuse the entire Humboldt County District Attorney's Office.

The California Court of Appeal denied Petitioner's claim as follows:

V.   The Denial of Defendant's Request to Recuse the District Attorney's Office.

Finally, defendant contends the trial court should have granted his postverdict, presentencing motion to recuse the entire Humboldt County District Attorney's Office. The motion was triggered by a 30-second television campaign ad for the re-election of the district attorney, which both parties describe as "sensational."  Defendant states the ad was part of the district attorney's "tough on crime" election theme.  The parties agree the ad featured voiceovers by District Attorney Gallegos and the trial counsel in defendant's case, Deputy District Attorney Neel; focused on the dramatic "sting" operation to foil the murder of Jane Doe; pictured a freshly dug grave; and stated defendant had "drugged and raped" the vicitm.[17]

29

FN 17:  This is something of an exaggeration, but there is no excuse for defendant's conduct with Jane Doe.  She did actively seek cocaine from defendant on the night of the unlawful sexual encounters.  (<u>People v. Larsen</u> (Dec. 8, 2010, A126424) [nonpub. Opn.], pp. 1–2.)  But Jane Doe was a minor and defendant was an adult.  She was legally incapable of consenting to sex and it is illegal to provide drugs to a minor.

Defendant contends the entire prosecutor's office should have been recused because the ad could have triggered community pressure on law enforcement, the probation department, the prosecution, and the sentencing court, and thus adversely affect the sentencing decision – especially given the charges were inflammatory and the community was small.  Defendant claims this created a conflict of interest which should have led to the recusal of the entire district attorney's office.

A motion to recuse a prosecutor is directed to the sound discretion of the trial court, and we review a denial of such a motion deferentially under a standard of abuse of discretion.  (<u>People v. Gamache</u> (2010) 48 Cal.4th 347, 366, fn. 5 [106 Cal.Rptr.3d 771, 227 P.3d 342]; <u>Haraguchi</u>, <u>supra</u>, 43 Cal.4th 706, 711, 713.)  The defendant bears the burden of showing a conflict of interest, and the trial court should not grant a recusal motion unless there is a reasonable possibility the prosecution may not exercise its discretionary function in an evenhanded manner, to enable the fair treatment of the accused.  (<u>Haraguchi</u>, <u>supra</u>, at p. 709; <u>Eubanks</u>, <u>supra</u>, 14 Cal.4th 580, 592.)  "Recusal of an entire district attorney's office is an extreme step.  The threshold necessary for recusing an entire office is higher than that for an individual prosecutor."  (<u>People v. Cannedy</u> (2009) 176 Cal.App.4th 1474, 1481 [98 Cal.Rptr.3d 596].)  An entire office should not be recused "'in the absence of some substantial reason related to the proper administration of criminal justice.' [Citations.]"  (<u>Id</u>. at p. 1482.)

We see no abuse of discretion in this case.  First, the trial court observed that the question was not whether running the ad before sentencing was good or bad judgment, but whether it created a conflict of interest.  The court found no such conflict and emphatically stated:  "[N]othing about the advertisement has in any way, shape, or form affected me.  And I'm the one [who] makes the ultimate decision in the case."  Second, the prosecution apparently did not submit a statement in aggravation at the time of sentencing, and the 25-to-life sentence on the conspiracy conviction was statutorily mandated.  (§§ 182, subd. (a), 190, subd. (a).)  The trial court did not err by denying the motion to recuse the entire prosecutor's office.

Exhibit G at 30–32.

Petitioner has not identified any clearly established Supreme Court precedent requiring recusal of an entire prosecutor's office on these facts — i.e., where the district attorney released a sensational ad regarding the defendant's case after the jury reached its verdict but before the defendant was sentenced.  In light of the absence of Supreme Court authority, it cannot be said that the state court's denial of this claim was contrary to, or an unreasonable application of, clearly

United States District Court
Northern District of California

established federal law.  Williams, 529 U.S. at 412–13.

Furthermore, Petitioner has failed to demonstrate that the failure to recuse the Humboldt County District Attorney's Office negatively affected his sentence.  Petitioner was sentenced to 25 years to life on the conspiracy to commit murder charge, and the maximum sentence of nine years for the solicitation to commit murder charge, which was to run concurrently with his other sentence.  CT at 1323–24.  The 25 years to life sentence for conspiracy to commit murder was statutorily mandated, Cal. Penal Code §§ 182(a) and 190(a), and not within the discretion of the judge.  The sentence for solicitation did not greatly effect the maximum term that Petitioner would receive.  Furthermore, the record does not indicate that the District Attorney's Office exhibited any bias with regard to Petitioner's sentencing.  CT at 1270 and RT at 2235.  The prosecutor did not submit a statement of aggravation, and the probation department recommended that Petitioner serve the middle term of six years for the solicitation charge.

Finally, the Court finds no merit in Petitioner's claim that the Humboldt County District Attorney had a financial interest in the outcome of the trial that rendered Petitioner's trial fundamentally unfair.  Petitioner argues that the district attorney's reelection campaign committee made significant expenditures on the television advertisement and that Petitioner's acquittal would have resulted in the campaign committee having wasted a large portion of its "warchest."  Petitioner provides no evidence to support this allegation, and the financial interest is too attenuated to raise concern.  See, e.g., Gallego v. McDaniel, 124 F.3d 1065, 1079 (9th Cir. 1997) (prosecutor's direct pecuniary interest in the outcome of a case that has an impact on the prosecutor's decision whether or not to enforce a particular statute may have constitutional ramifications) (citing Marshall v. Jerrico, Inc., 446 U.S. 238, 249–50 (1980)).  Moreover, as discussed above, there is no evidence that the television advertisement negatively affected this sentence.  See id. (no prosecutorial misconduct will be found absent a showing of prejudice).

This claim is denied.

//

//

//

E.      Certificate of Appealability

The federal rules governing habeas cases brought by state prisoners require a district court that issues an order denying a habeas petition to either grant or deny therein a certificate of appealability.  See Rules Governing § 2254 Case, Rule 11(a).

A judge shall grant a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the certificate must indicate which issues satisfy this standard.  Id. § 2253(c)(3).  "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: [t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  Slack v. McDaniel, 529 U.S. 473, 484 (2000).

Here, Petitioner has not made such a showing, and, accordingly, a certificate of appealability will be denied.

## IV.  CONCLUSION

For the reasons stated above, the petition for a writ of habeas corpus is DENIED, and a certificate of appealability is DENIED.

The Clerk shall enter judgment in favor of Respondent and close the file.

**IT IS SO ORDERED.**

Dated: February 23, 2015

_____
JON S. TIGAR
United States District Judge